1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6      FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8   ANTOINE M. CRECY,                    )
                                         )
9              Petitioner,               )       No C 03- 3703 JSW (PR)
                                         )
10      vs.                              )       ORDER DENYING PETITION
                                         )       FOR A WRIT OF HABEAS
11  D.L. RUNNELS, Warden,                )       CORPUS
                                         )
12             Respondent.               )
    ─────────────────────────────       )
13
14
15                    **INTRODUCTION**
16          Antoine M. Crecy, a prisoner at High Desert State Prison, has filed a *pro*
17  *se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Per order
18  filed on September 26, 2003,  this Court found that the petition stated cognizable
19  claims under § 2254 and ordered Respondent to show cause why the petition
20  should not be granted.  Respondent filed its answer on October 29, 2003.
21  Petitioner's traverse to the answer was filed on December 1, 2003.  On
22  November 4, 2005, Petitioner filed a motion for leave to amend, adding claims to
23  his petition for writ of habeas corpus.  Respondent filed a supplemental response
24  to Petitioner's amended habeas petition on April 19, 2006.  Petitioner filed a
25  supplemental traverse on June 6, 2006.  This order denies the petition for writ of
26  habeas corpus on the merits.
27                 **PROCEDURAL BACKGROUND**
28          On March 22, 1999, a jury in San Mateo County convicted Petitioner of

two counts of first degree murder, robbery, attempted robbery, and first degree burglary.  The jury also found true enhancement allegations that Petitioner was armed with a firearm, and that the murders occurred during the commission of a burglary and attempted robberies.  The jury found not true enhancement allegations that Petitioner personally used a firearm during the commission of the charged crimes.  Petitioner was sentenced to life in prison without possibility of parole.  The California Court of Appeal,  First Appellate District, affirmed the conviction on direct appeal on February 4, 2002.  The Supreme Court of California denied a petition for review on May 1, 2002.  Petitioner filed the instant petition on August 7, 2003.

## **FACTUAL BACKGROUND**

The facts underlying the charged offenses as found by the California Court of Appeal, First Appellate District, are summarized below.[1]  After a review of the trial record, this Court found additional facts which are identified as such below.

*Chronology*

On Friday afternoon, September 12, 1997, Diane McClanahan, deposited a check of approximately $50,000 in her bank account.  The check represented her share of her paternal inheritance.  She had already taken possession of her late father's 1987 Oldsmobile Cutlass.  During this time, McClanahan was staying at Winferd Flewellen's apartment in Daly City as she prepared to move out of the San Francisco Bay area.

On Sunday morning, September 14, Flewellen, using McClanahan's Cutlass, picked up some personal belongings from his father's San Francisco house.  He also picked up Petitioner in San Francisco and took him to the Daly City apartment.  Petitioner was acquainted with McClanahan and Flewellen because they bought small pieces of rock cocaine from him.  At the apartment he sold them some cocaine, helped move some furniture, watched football, and drank a beer, after which Flewellen drove him back to a party in San Francisco in the Cutlass, dropping him off in the early afternoon.

On the same Sunday afternoon Flewellen again stopped by

---

[1]  *People v. Crecy*, No. A091674, slip op. at 2-8 (Cal. Ct App. Feb. 4, 2002).

2

his father's San Francisco house to pick up some more personal belongings. He left his father's house at approximately 3:30 p.m. that afternoon, driving the Cutlass.

On Monday morning, September 15, between midnight and 1:00 a.m., neighbors heard approximately three or four gunshots from Flewellen's apartment, followed by a pause and then four more gunshots. The neighbors saw nothing at Flewellen's apartment and did not telephone the police because they thought someone else would do so.

At approximately 6:30 a.m. that same Monday, McClanahan's Cutlass was reported as blocking the driveway of a San Francisco roofing company. There was no indication it had been "hot-wired" or broken into. Its windshield wipers were in their intermittent position, and there had been heavy fog the night of September 14-15. The roofing company is a few blocks from Petitioner's grandmother's house, where Petitioner occasionally spent the night.

On Thursday morning, September 18, the maintenance man for Flewellen's apartment complex went to Flewellen's apartment to install a curtain rod. There was no response to his knock, and a foul smell emanated from the apartment. The maintenance man admitted himself and saw Flewellen and McClanahan lying dead in the apartment hallway.

Flewellen had been killed by a single gunshot to the head and neck. McClanahan was killed by seven gunshots. Both victims were shot at close range. Eight forty-five caliber casings were found near the bodies; they were all fired from the same semiautomatic gun, probably a Glock 21. The casings could not have been fired from a nine-millimeter gun.

There was no sign of forced entry into the apartment, but it appeared ransacked, as if someone had been looking for something. Cocaine base rocks in personal use quantity and other drug paraphernalia were found in the living room. Keys to the ignition and trunk of the Cutlass were also in the apartment.

On Saturday, September 20, an autopsy was performed on the victims. The examining pathologist testified that the state of their decomposition was consistent with death late September 14 or early September 15.

On Sunday, September 21, Daly City Police Department Detective William Thompson returned to Flewellen's apartment, which had been sealed, after receiving information that two African-American males, one of whom was carrying a 10 inch kitchen knife, were seen leaving the area around the apartment the previous Tuesday, September 16. Petitioner is African-American. Thompson noticed that a knife was missing from a block-like knife

3

holder, designed to hold a set of wood-grained handled kitchen knives of varying lengths.  He also noticed a slit, apparently made by a knife, in the underside of a living room ottoman.

On October 21, 1997, Deeb Ali was working as a clerk in a San Francisco liquor store.  He saw Petitioner, whom he knew as a regular store customer, fighting with several people just outside the store.  Afraid the store would be broken into, he pushed an inside button that summoned the police.  He then went outside and saw Petitioner holding a big black automatic gun and heard him say he wanted to "kill everybody" and had already "killed two people in Daly City."  When the police arrived, Petitioner, holding his gun, walked into the bathroom at the rear of the store.  The police found Petitioner in the bathroom, but did not find a gun on him.  After detaining Petitioner briefly, the police released him and he departed.  Ali then told the police that Petitioner had a gun inside the store and that he claimed to have killed two people in Daly City.  Neither Ali nor the police could find the gun.  Forty minutes later, Petitioner returned to the liquor store,  apologized to Ali, went back to the bathroom, and came out putting a gun in the front of his pants.

San Francisco Police Officer Brian Nannery was called as a witness for the defense.[2]  During his testimony, Officer Nannery provided his version of the liquor store incident, which differed in some particulars from Ali's version.  Nannery responded to the silent alarm and was told by the dispatcher that a man with a gun might be in the store.  When Nannery arrived at the store, a very nervous Ali told him there was a person inside with a gun, but the police did not find anybody inside the store.  Five or ten minutes after he arrived Nannery encountered Petitioner outside of the store.  He detained and pat-searched him, but found no gun.  Ali then told Nannery that he had seen Petitioner with a gun.  The police searched the store thoroughly but found no gun.

The following night, October 22, Nannery returned to the store to ask Ali if there had since been any problems.  Ali told Nannery he was "really scared," and that the previous night the Petitioner had stated, "I killed two people in Daly City, don't fuck with me."  The San Francisco police had been informed of the double homicide in Daly City, so Nannery relayed the liquor store incident to the Daly City police.  On October 31, Detective Thompson, after speaking with Officer Nannery, met with Ali.  Ali told Thompson that, he heard Petitioner claim, in front of the liquor store, that he had killed people in Daly City.

On the morning of November 7, Petitioner was arrested for the instant offenses at his mother's San Francisco Western

---

[2]  This factual finding derives from the trial record.  R. Exh. B; Reporter's Transcript ("RT") at 830.

4

Addition house, where he sometimes resides.  He was taken to the Daly City police station interview room while the police searched his mother's and grandmother's houses.  They found a non-functioning gun laser sight in his bedroom at his mother's house.

*Statement to Police*

At 1:00 p.m., November 7, Detective Thompson advised Petitioner of his rights pursuant to *Miranda v. Arizona* 384 U.S. 436 (1966).  Petitioner indicated he understood them and agreed to give a statement.  The videotaped interview concluded after midnight.

During his statement Petitioner initially denied having any contact with the victims after Flewellen dropped him off at the party on Sunday afternoon, September 14.  He acknowledged the October fight in front of the liquor store, but he denied ever saying he killed two people in Daly City.  He stated that he said only "'I heard people got killed . . . in Daly City,'" or "'Both of 'em are dead.'"  He also acknowledged owning a black nine-millimeter "Witness" that holds 15 rounds.

Petitioner subsequently stated that during the drive back to San Francisco on Sunday, September 14, Flewellen told him about McClanahan's $50,000 inheritance and indicated it was in his bedroom at the Daly City apartment.  After the party, he saw "L," whom he knew, on the street in his car with another man he did not know.  "[A] long time" before he ran into L, also called "Little L," L asked him if he knew "somebody with some money," so when he saw him in the street, Petitioner told L he had a "lick" (street parlance for robbery) for him in Daly City, referring to McClanahan's $50,000 inheritance.  L replied, "C'mon right now, let's go."  Petitioner agreed to get the money "right now."  L also offered to "get rid of them."

He, L, and the third man drove in L's car to Flewellen's apartment and knocked on the door.  They all wore gloves and masks that covered the entire face.  Petitioner's mask was a watch cap in which he had cut eye holes.  Petitioner walked in the front door behind L and the other man, and did not say anything to McClanahan or Flewellen, who were in the living room.  L, pointing a handgun at the victims, ordered them to lie on the ground.  Petitioner thought L's gun was either a nine-millimeter or a forty-five.  Petitioner was holding a stolen black "9 millimeter" containing a "straight stack" in his pocket, but he did not put it to either victim's head.  The third man had a black handgun, probably a forty-five.

L and the third man guarded the victims while Petitioner went to the bedroom to look for McClanahan's money.  Without finding any money he left the bedroom after a few minutes because he was scared, and decided to leave the apartment.  When he returned to the front of the apartment, "they was coverin' him, they

were already covered up on the ground." He heard McClanahan say, "What did you do, Mick? What you do?" He also heard her beg not to be killed, to which someone told her to "shut up." He heard L ask them "Where the money at?" and McClanahan replied that it was in a pouch.

Petitioner "couldn't take it" and had to leave because he knew the victims personally and no longer wanted to be part of the crime. He ran down the stairs of the apartment building and did not see a gun or hear any gunshots. He waited for L and the other man in L's car. L joined him a minute later, saying "we gotta go." L had found a pouch containing about $1,000 in the apartment bedroom and gave him some of it. He and L departed in L's car. The third man departed in the Cutlass and then "dumped" it.

In his statement to police, Petitioner denied ever touching anybody, and "[wasn't] killing nothin." He "didn't hear no shot, [;] I said, L [was] shootin', I didn't shoot nothin'[ ]." He did not know which victim was shot first or what happened because when he "was leaving," there was a sheet over the victims, and he was not in the room when it was placed over them.   When asked whether L was the one who pulled the trigger, Petitioner responded, "That's the only person."[3]   As he characterized the event, "The bottom line is the whole thing went bad."

In his statement to police, Petitioner admitted he was involved in a robbery, but not a murder. He denied ever driving the Cutlass. He threw away the nine-millimeter gun he had taken to Flewellen's apartment down a gully at the bottom of a hill.

The interview concluded with Petitioner writing a letter of apology to the victims' families. He took blame for the robbery but not the murders, which he described as an "outcome" which "did not happen by my say so."

*Holding Cell Conversation*

After Petitioner gave his statement, he was placed in a holding cell with Mason Reid and another unnamed inmate. According to Reid's testimony, Petitioner told them the police had searched two houses, and he was surprised they had not discovered his gun in either one. Petitioner also told them a "rat" in federal custody had given his name to the police as the murderer; that this "rat" could not know who committed the murders because the "rat" was in the car when the murders occurred; and that Petitioner was present when the "rat's" cousin shot the victims.

*Defense*

Petitioner's trial testimony generally paralleled his

---

[3] This factual finding derives from Petitioner's interrogation and confession offered into evidence at trial. R. Exh. I, RT at 1227.

6

statement to the police.  The principal difference was his claim that only he and L, then identified as Lawrence Thomas, went to the Daly City apartment; there was no third participant.  He also testified that when he and L left the apartment, it was not ransacked, and the victims were lying alive on the living room floor under a white or yellow cover, not, as the police found them, in the hallway under a salmon or red cover.  He denied that Deeb Ali ever saw him with a gun during the liquor store incident.

Tiffany Williams, Petitioner's girlfriend, testified that Petitioner regularly visited her on Sunday nights in August and September 1997.  He was asleep at the San Francisco house she shared with her mother when she returned from work at 12:30 a.m., Monday, September 15.  Williams lived in the Visitacion Valley neighborhood, a 20 to 25 minute drive from Flewellen's apartment. Tiffany's mother, Bernadine, testified that Petitioner regularly visited on Sundays and arrived at her house between 10:00 p.m. and 10:30 p.m. on Sunday, September 14, 1997.

Emma Fontalilla lived across the street from the roofing company.  She saw a car blocking its driveway when she arrived home from work between 11:30 p.m. and midnight on September 14, 1997.

San Francisco Police Officer John Pragagnolo arrested Lawrence Thomas in his van the night of September 3-4, 1997, 10 days before the present offenses.  In their search of Thomas's van, the police recovered two Glock semiautomatic handguns with laser sights, a loaded magazine, three black knit caps with eye and mouth cutouts, and a substantial amount of crack cocaine.  Thomas was released on an unknown date after his arrest.  He was arrested again on September 19, 1997, and a mask made of wetsuit material, designed to cover the mouth area, was found in his pocket.  At the time of the present trial in March 1999, Thomas's September 3, 1997 arrest had resulted in a federal conviction, and the guns and the knit caps seized during that arrest had not been released from police custody.

San Francisco Police Officer Nannery testified that he was knowledgeable about the U.N.L.V. street gang.[4]  On direct examination, Officer Nannery testified that he was unaware of Petitioner being involved in any gang activity.[5]  On cross examination, Officer Nannery stated that he knew that Thomas was a member of U.N.L.V. and that Thomas and Petitioner were friends.[6]  During cross-examination, Officer Nannery also

---

[4] This factual finding derives from the trial record.  R. Exh. B; RT at 851.

[5] This factual finding derives from the trial record.  R. Exh. B; RT at 852.

[6] This factual finding derives the trial record.  R. Exh. B; RT at 856.

identified Petitioner and his uncle in a photograph in which they were making a sign for "415," a symbol for the U.N.L.V. gang.[7]

Three long-time friends of Petitioner testified that they witnessed the October fight at the liquor store. None of them heard Petitioner refer to the killing or wanting to kill anyone.

## **STANDARD OF REVIEW**

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As summarized by the Ninth Circuit: "A state court's decision

---

[7]  This factual finding derives from the trial record. R. Exh. B; RT at 854-855.

can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) *overruled on other grounds*; *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).  In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal habeas court should conduct an independent review of the record.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the

9

state court decision.  *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id*.

In his petition for writ of habeas corpus, Petitioner asserts three claims for relief: (1) that his statement to police was taken in violation of his *Miranda* rights and thus should not have been admitted during trial, (2) ineffective assistance of counsel based on trial counsel's failure to object to questioning about gang evidence and Petitioner's prior bad acts, and trial counsel's failure to call favorable defense witnesses, and (3) that Petitioner's conviction for murder was inconsistent with the jury's findings that Petitioner did not personally use a weapon.

## DISCUSSION

**A.**      **Violation of Miranda Rights**

### 1.      **Legal Standard**

Petitioner claims that his *Miranda* rights were violated during his interrogation by police.  Petitioner asserts that his will to exercise his right to remain silent was overborne by coercive police tactics and that he was improperly questioned after invoking his right to counsel.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a person subjected to custodial interrogation must be advised that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed.  These warnings must precede any custodial interrogation, which occurs whenever law

10

enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action. *Id* at 444. The requirements of *Miranda* are "clearly established" federal law for the purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005); *Jackson v. Giurbino*, 364 F.3d 1002, 1009 (9th Cir. 2004).

Once properly advised of his rights, an accused may waive them voluntarily, knowingly, and intelligently. *See Miranda* 384 U.S. at 475. The government must prove waiver by preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168-9 (1986). The waiver need not be express as long as the totality of the circumstances indicates that the waiver was knowing and voluntary. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Although the burden is on the government to prove voluntariness, a waiver cannot be held involuntary absent official compulsion or coercion. *See Connelly*, 479 U.S. at 170.

The remedy for a violation of *Miranda* rights is the suppression, at the subsequent trial, of the statements made incriminating the defendant in the crime about which he was questioned. *Miranda*, 384 U.S. at 479. Habeas relief should be granted if the admission of statements in violation of *Miranda* "had substantial and injurious effect or influence in determining the jury's verdict." *Jackson* 364 F.3d at 1010 (quoting *Calderon v. Coleman*, 525 U.S. 141, 147 (1998)).

    **2.**        **Analysis**
           **i.**        **Voluntariness of Statement**

A statement is involuntary and subject to exclusion if it was the product of physical or psychological coercion on the part of the police. *Rogers v. Richmond*

11

365 US 534, 540 (1960).  Petitioner alleges that his statement to police was in violation of his *Miranda* rights and thus should have be inadmissible because his will to exercise his right to remain silent was overborne by coercive tactics on the part of the police.  In this regard, Petitioner alleges that police "constantly pressured Petitioner to confess over a twelve-hour period under anxiety inducing condition[s]."  Pet. Exh. B at 15.  Petitioner alleges that he was cold and tired during the interrogation, which created a physical condition that "had a mental [e]ffect on Petitioner and definitely played a major role that induced critical statements from Petitioner."  Pet. Exh. B at 12.  Petitioner also alleges that during the interrogation, police officers elicited his statement through promises of leniency.

In determining whether a defendant's will was overborne and a statement was involuntary, the reviewing court must assess the totality of the circumstances surrounding the interrogation.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).  To determine voluntariness of a statement under *Miranda*, courts have considered the intelligence and education of the defendant, as well as the defendant's prior experience with police.  *Reck v. Pate*, 367 U.S. 433, 441 (1961) (court considered defendant's subnormal intelligence and lack of experience with police as factors in determining that statement was involuntary); *Fare v. Michael C.*, 442 U.S. 707, 726 (1979) (court considered lack of evidence that defendant was of insufficient intelligence and defendant's considerable experience with the

12

police to determine that defendant's statement was voluntary).  Courts have also considered the nature of the interrogation to determine voluntariness of a statement made to police.  *Ashcraft v. Tennessee*, 322 U.S. 143, 149 (1944) (court determined that defendant's statement was involuntary due to the defendant being subjected to a thirty-six hour interrogation conducted by police officers that acted in relays).

The Court of Appeal determined that Petitioner's will to exercise his right to remain silent was not overborne by coercive police tactics. The Court of Appeal concluded that there was no indication from Petitioner's background or characteristics that he was incapable of fully comprehending that he was waiving his *Miranda* rights by making a statement to the police.  The Court of Appeal noted that Petitioner was informed of his *Miranda* rights by police upon his arrest.  The Court of Appeal considered the Petitioner's age, education, class, employment experience, and experience with police in determining that Petitioner's statement was voluntary.  Additionally, the Court of Appeal determined that Petitioner's complaints about being tired and cold were observations about himself and were not sufficient to induce him to make a statement against his will.  To support their conclusion, the Court of Appeal noted that Petitioner was continually offered "creature comforts," such as food, beverages, bathroom breaks, and cigarettes, and the fact that upon returning to the holding cell after the interrogation, Petitioner did not sleep despite his

1   complaints of tiredness during the interrogation.

2       The Court of Appeal also determined that Petitioner's statement was not

3   improperly induced by promises of leniency on the part of the police.  Under

4   Ninth Circuit precedent, police officers cannot suggest that the right to remain

5   silent may result in harsher treatment of a defendant by the prosecutor without

6   violating the defendant's *Miranda* rights.  *United States v. Harrison*, 34 F.3d

7   886, 891-2 (9th Cir. 1994).  However, the police can offer to tell the prosecutor

8   about a defendant's cooperation and suggest to a defendant that their cooperation

9   may increase the likelihood of a more lenient sentence.  *United States v.*

10  *Williard*, 919 F.2d 606, 608 (9th Cir. 1990).  The Court of Appeal supported its

11  determination by noting that the police officers encouraged Petitioner to tell the

12  truth and did not assure Petitioner of a specific punishment or favorable action if

13  he confessed but merely suggested that the prosecutor may look more favorably

14  upon a defendant that told the truth.

15      The Court of Appeal's conclusion is not contrary to, or an unreasonable

16  application of federal law as determined by the Supreme Court.  In *Schneckloth*,

17  the Supreme Court stated that in determining whether a defendant's statement to

18  police was overborne by coercive tactics and thus involuntary, the reviewing

19  court must consider the totality of the circumstances surrounding the

20  interrogation.  412 U.S. at 226.  The Court of Appeal made its determination by

21  considering the totality of the circumstances surrounding the interrogation, such

14

as the Petitioner's characteristics, the nature of the interrogation, and the police officers' encouragement of the Petitioner to make a statement.  Therefore, the Court of Appeal's conclusion that Petitioner voluntarily waived his *Miranda* rights by making a statement and was not overborne by coercive police tactics is consistent with controlling federal law.

### ii.        Invocation of Right to Counsel

A suspect who has expressed a desire to have counsel present during a custodial interrogation is not subject to further interrogation by the authorities until counsel is made available to him.  *Edwards v. Ariz*, 451 U.S. 477, 484-5 (1981).  However, authorities can continue an interrogation if the accused voluntarily offers information or does not clearly request an attorney.  *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983); *Davis v. U.S.*, 512 U.S. 452, 459-62 (1994).  The Supreme Court has held that a defendant's invocation of right to counsel must be unambiguous and unequivocal.  *Davis*, 512 U.S. at 462 (Court affirms lower court's conclusion that defendant's statement of "maybe I should talk to a lawyer" was not an unambiguous invocation of his right to counsel).

Petitioner alleges that he invoked his right to counsel during the interrogation and that the police officers did not suspend their questioning, thus violating Petitioner's *Miranda* rights. During his interrogation, Petitioner asked to telephone his mother and stated that he was "gonna get me an attorney."

When asked by the interrogating officer if obtaining an attorney was something Petitioner wanted to do at "this moment" or if it was something that he wanted to do "after we have talked about the situation," Petitioner responded, "We can. We can talk first and then we can you know."  After a review of the interrogation transcripts, it is clear that while being questioned, Petitioner never clearly stated that he wanted counsel present.

The Court of Appeal concluded that Petitioner's statements regarding an attorney during the interrogation could not reasonably be read to be an unambiguous request for an attorney at that moment.  The Court of Appeal determined that Petitioner's statement, "I'm gonna get me an attorney" was a comment by Petitioner about obtaining counsel in the future and in response to the interrogating police officer's statement about the district attorney's future involvement in the case.  The Court of Appeal determined that this was not an unambiguous and present request for counsel.  Additionally, the Court of Appeal noted the attempt by the interrogating officers to clarify Petitioner's statements to make sure that Petitioner was not making a present request for counsel.  As stated by the Supreme Court in *Davis*, controlling federal law requires that an invocation of right to counsel be unambiguous and unequivocal.  512 U.S. at 459.  Thus, the Court of Appeal's conclusion is not inconsistent with controlling federal law and is therefore a reasonable application of federal law established by the Supreme Court.

**B.**    <u>**Ineffective Assistance of Counsel**</u>

**1.**    **Legal Standard**

Petitioner argues that he suffered ineffective assistance of counsel due to his defense attorney's failure to object to admission of gang evidence and his prior bad acts and failure to call favorable defense witnesses.  A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  *Id.*

To prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id*. at 687-88.  Additionally, Petitioner must establish that he was prejudiced by counsel's deficient performance and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings.  *Id.*

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the

17

alleged deficiencies.  *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining Petitioner could not establish prejudice), *cert. denied*, 516 U.S. 1124 (1996).

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Williams (Terry) v. Taylor*, 529 U.S. 362, 404-08 (2000).  In a federal habeas challenge to a state criminal judgment, a state court's conclusion that counsel rendered effective assistance is not a fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d).  Both the performance and the prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.  *See Strickland* 466 U.S. at 698.  Claims of ineffective assistance therefore require a review of the record as a whole.

      **2.**    **Analysis**

          **i.**    **Failure to Object to Gang Evidence and Prior Bad Acts**

Petitioner asserts that his defense counsel's failure to object to the prosecutor's cross-examination of Petitioner regarding gang evidence and his prior bad acts constituted ineffective assistance of counsel.  Defense counsel was first to introduce evidence about the U.N.L.V. gang during his direct examination of Police Officer Nannery.  The prosecution allowed defense counsel to interrupt

her cross-examination of Petitioner to call Officer Nannery to the stand because the defense suggested Nannery would not be available to testify at a later date.

Officer Nannery testified that he was knowledgeable about the members of the U.N.L.V. gang and that he was unaware of Petitioner being involved in any gang activity.  On cross examination, Officer Nannery testified that he knew that Lawrence Thomas was a member of U.N.L.V. and that Thomas and Petitioner were friends.  During cross-examination, Officer Nannery also identified Petitioner and his uncle in a photograph in which they were making sign for "415" and "L.V.," U.N.L.V. gang symbols.  Petitioner was then extensively questioned about his involvement in the U.N.L.V. gang during cross examination by the prosecutor.  Petitioner admitted to owning a t-shirt depicting a person named "Tweef" (through its questioning of Petitioner on cross-examination, the prosecution suggested that Tweef was Petitioner's gang nickname) wearing a mask, holding two guns, and wearing a belt bearing the number "187" (identified by Officer Nannery as the Penal Code section number for murder).  R. Exh. B; RT: 871, 874.  Printed on the t-shirt was, "Welcome to San Franpsycho, enter at your own risk, population rapidly decreasing, p.s., rest in piss," and pictured two bullet holes.  R. Exh. B; RT: 874  Petitioner testified that the t-shirt was to promote a rap group called U.N.L.V., not a street gang, and denied being a member of the U.N.L.V. street gang.  R. Exh. B; RT: 880.

During further cross-examination, the prosecutor questioned Petitioner

19

about his making threatening and racially derogatory remarks to an Asian police

officer and his "gay bashing" an Asian man during an altercation on a bus in the

Castro neighborhood of San Francisco.  Regarding the incident with the police

officer, the prosecution asked Petitioner if he had threatened to "kill you cops"

and called the police officer a "China mother fucker."  R. Exh. B; RT:1062.

Petitioner denied making the threatening and racially offensive statements to the

Asian police officer.  R. Exh. B; RT: 1062.  Petitioner also denied the gay-

bashing, stating that the altercation with the Asian man on the bus was a regular

fight provoked by the other man calling Petitioner a "nigger."  R. Exh. B; RT:

1063.  Defense counsel did not object to any of this line of cross-examination

with the exception of several objections regarding questions that were "asked and

answered" or "compound" questions.

Defense counsel's decision to offer gang evidence through Officer

Nannery and his failure to object to the line of cross-examination was the subject

of a motion for a new trial (brought by Petitioner's newly retained counsel) in

front of the trial court.  R. Exh. A; Clerks Transcript ("CT") at 909.  This motion

was denied on May 19, 2000.  R. Exh. A; CT at 910.  In the course of that

proceeding, trial counsel Bloom testified about the reasoning behind his

decisions and conduct as Petitioner's defense attorney.  Upon its review of the

ineffectiveness claim, the Court of Appeal considered the explanations of the

defense attorney regarding his introduction of gang evidence and his failure to

object to questioning regarding Petitioner's prior bad acts.  The Court of Appeal accepted defense attorney's explanation that his introduction of the gang evidence was a strategic attempt to "cut off that whole area."  Defense counsel knew that the prosecutor had information regarding the U.N.L.V. gang and thought that Officer Nannery's testimony that Petitioner was known not to be a member of the gang was important evidence.  Concerning the prosecutor's questioning of Petitioner regarding his prior bad acts, trial counsel testified that he viewed this area of questioning as mere allegations that were unsupported by evidence and thus demonstrated the weakness of the prosecutor's case.

In determining whether or not ineffective assistance of counsel occurred, a trial attorney's strategic decisions are given wide deference and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available.  *See Strickland*, 466 U.S. at 689; *United States v. Gibson*, 690 F.2d 697, 703-04 (9th Cir. 1982) (failure to make evidentiary objections does not render assistance ineffective unless challenged errors can be shown to have prejudiced the defense).  Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

The trial record establishes that defense counsel based his conduct on

strategic considerations which were based on his investigation of the case.

However, in viewing the record as a whole, it is questionable whether defense

counsel's decisions to offer and not object to this evidence were reasonable.

While the Court of Appeal found this evidence only "potentially volatile,"

defense counsel's strategic choices resulted in the admission of a significant

amount of extremely damaging evidence against Petitioner, that may not have

otherwise been admitted.  In fact, during his testimony at Petitioner's motion for

a new trial, defense counsel acknowledged that he "probably" should have

moved before trial to exclude all of the evidence of gang membership.  *Crecy*,

slip op. at 19.

Although this Court finds that counsel's decisions to introduce and not

object to extensive cross-examination regarding gang activity and highly

inflammatory prior bad acts was certainly troubling in hindsight, it is also clear

that defense counsel's decisions were not sufficiently prejudicial to undermine

confidence in the outcome of the proceedings.  The Court of Appeal noted that

Petitioner's denial of gang membership was supported by the generally credible

testimony of a police officer.  Additionally, the Court of Appeal noted that

Petitioner denied committing the prior bad acts about which the prosecutor

questioned and that she offered no independent proof thereof.  Thus, the Court of

Appeal determined that the impact of this evidence that defense counsel failed to

object to was minimized and therefore does not meet the *Strickland* test for

prejudice.

The Court of Appeal also noted that, even without the evidence that was admitted due to defense counsel's allegedly deficient acts, the evidence of Petitioner's guilt was "extremely strong."   The Court of Appeal points out that Petitioner admitted suggesting the robbery to Lawrence Thomas and participating in it with him, and that they were both carrying guns at the time. According to the Court of Appeal, given these admissions, "it is not reasonably probable that the jury would have found [Petitioner] guilty of lesser offenses absent his attorney's challenged acts."

The Court of Appeal's determination that the defense counsel's challenged acts were not prejudicial is not an unreasonable application of controlling federal law.  Where a defendant is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had reasonable doubt respecting guilt." *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695). The prosecution's case against the Petitioner was extremely persuasive. Petitioner admitted to an armed robbery of the victims on the day of the murder and to leaving the apartment while both victims lay under a sheet (which was how their dead bodies were discovered.)  McClanahan's car was found abandoned, miles away from Flewellen's apartment, near where Petitioner's grandmother lives, where Petitioner sometimes stayed.  There was testimony by

Mason Reid that Petitioner made statements in the jail cell after his arrest indicating that he was involved in the murders.  Further, Deeb Ali testified that Petitioner bragged about "killing two people in Daly City" weeks after the murder in front of a San Francisco liquor store.  And Petitioner's credibility was damaged during his testimony when the prosecution highlighted contradictions with Petitioner's statements to the police in several significant respects.  Due to the strength of the prosecution's case against the Petitioner, Petitioner is not able to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Strickland* 466 U.S. at 694.

### ii.      Failure to Call Favorable Defense Witnesses

As stated in *Strickland*, trial tactics and strategy by defense attorneys are afforded great deference in an ineffective assistance of counsel claims.  466 U.S. at 689.  Petitioner's defense counsel provided strategic explanations regarding his failure to call favorable witnesses Lorenzo Ayala, Erika Apps, Arnold Bustria, Jessica Alvarado, and Janill Rosa.

Regarding Lorenzo Ayala, who Petitioner asserts was present during Petitioner's conversation with jail informant Mason Reid, defense counsel noted that Ayala was subpoenaed but did not show up to testify.  R. Exh. F. at 21. Defense counsel supports his decision not to move for a continuance to track down Ayala based on Ayala's statements to police.  Defense counsel believed

that it was possible that Ayala's testimony would corroborate testimony given by holding cell informant Reid or that Ayala would not remember anything when called to the stand.  R. Exh. F at 21.  Additionally, defense counsel stated that he did not call Erika Apps because his interview of her made clear that Apps would reiterate the same testimony of three other defense witnesses that did take the stand.  R. Exh. F at 22.  Defense counsel also explained his failure to call the three witnesses from the apartment complex, Arnold Bustria, Jessica Alvarado, and Janill Rosa, on his inability to locate them to testify despite his efforts to find them.  R. Exh. F at 23.

The strategic reasons presented by defense counsel in support of his decision not to call potential defense witnesses are not unreasonable and do not fall below an objective standard of reasonableness under prevailing professional norms.  Defense counsel's decision not to call potential witnesses was made after a reasonable investigation or interview of each witness noted in the habeas petition.  *Cf Avila v. Galaza*, 297 F.3d 911, 920 (9th Cir. 2002) (holding that failure to present certain witnesses' testimony is not a valid strategic decision when attorney never investigated witnesses' background or what testimony they could provide).

Even if defense counsel's failure to call favorable defense witnesses was found to be deficient, the second prong of the *Strickland* standard would not be satisfied because Petitioner does not establish that he was prejudiced by

counsel's performance.  To establish prejudice caused by the failure to call a

witness, Petitioner must show that the witness was likely to have been available

to testify, that the witness would have given the proffered testimony, and that the

witness' testimony created a reasonable probability that the jury would have

reached a verdict more favorable to the Petitioner.  *Alcala v. Woodford*, 334 F.3d

862, 872 (9th Cir. 2003).  Petitioner has not met the standard necessary to show

prejudice from counsel's decision not to offer these witnesses.

Regarding potential witness Ayala, Petitioner did not show that Ayala

would give the testimony that Petitioner asserted would be helpful to his defense

by impeaching holding cell informant Reid.  In fact, in a police interview of

Ayala, he told police that he remembered little of his conversation with Petitioner

other than telling him not to discuss the allegations against him.  R. Exh. F at 21.

Regarding Apps, Petitioner did not show how Apps' testimony would

create a reasonable probability that the jury would have reached a verdict more

favorable to him.  Apps' testimony would merely restate the testimony of three

other defense witnesses that Petitioner did not make any statements at the liquor

store about "killing two people in Daly City" and would not offer any new or

different testimony in support of Petitioner's case.

Additionally, regarding the three potential defense witnesses from the

Flewellen's apartment complex, Bustria, Alvarado, and Rosa, Petitioner did not

establish that these witnesses would have been available to testify, nor did he

26

show that their testimony would create a reasonable probability that the jury would have reached a verdict more favorable to him.  Despite efforts to locate them, the three apartment witnesses could not be found by the private investigator hired by defense counsel.  Additionally, all three apartment complex witnesses stated to police that they saw two men leaving Flewellen's apartment and carrying a kitchen knife two days after the murders occurred.  The potential testimony of these witnesses as to who was around Flewellen's apartment two days after the murders is not sufficient to undermine the prosecution's case regarding what occurred the night of the crime and Petitioner's involvement in the murders of Flewellen and McClanahan.

The Court of Appeal determined that defense counsel's tactical decisions not to call potential defense witnesses noted in the habeas petition was reasonable and thus did not satisfy the first prong of the *Strickland* standard, defeating Petitioner's claim of ineffective assistance of counsel.  Additionally, the Court of Appeal noted that it was doubtful that the failure to offer testimony from these potential witnesses would create prejudice necessary to satisfy the second prong of the *Strickland* standard.

The Court of Appeal's decision was not contrary to or an unreasonable application of established federal law determined by the Supreme Court. As stated by the Court in *Strickland*, "failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim"

necessary to support a petition for habeas corpus. *Strickland*, 466 U.S. at 700.
Defense counsel was able to point to tactical reasons for not calling the potential
witnesses, and defense counsel's strategic decisions are not unreasonable and
thus are afforded great deference. *Id.* at 689.  Additionally, Petitioner does not
establish that he was prejudiced by defense counsel's failure to call these
witnesses, that but for defense counsel's actions, the result of the state court
proceedings would have been different. *Id.* at 694.

## C.      Inconsistent Verdicts

      Petitioner asserts that because the jury failed to find true that he
personally used a weapon, his murder conviction cannot stand.  Petitioner argues
that because the jury was not presented with an aider and abettor theory at trial, a
finding that Petitioner did not personally use a weapon undermines a critical
element of his murder conviction.  To support his claim, Petitioner cites *Jackson
v. Virginia*, 443 U.S. 307 (1979), where the Supreme Court held that a criminal
conviction based on a record wholly devoid of any relevant evidence of a crucial
element of an offense is constitutionally infirm.  However, despite Petitioner's
reference to *Jackson*, Petitioner's claim is more logically construed as an
inconsistent verdict claim rather than a sufficiency of the evidence claim.
Petitioner does not assert that after viewing the evidence in a light most favorable
to the prosecution, no rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

Rather, Petitioner argues that without being presented with an aider and abettor theory, the jury's finding that he did not personally use a weapon and the murder conviction are inconsistent.

However, a review of the trial record shows that the prosecution presented an aider and abettor theory to the jury.  RT: 1148- 1150.  Additionally, the jury received instructions from the trial court on an aider and abettor theory.  CT: 468, 483, 503-04.  Therefore, based on the evidence presented at trial by the prosecution, Petitioner could have been found guilty of murder through an aider and abettor theory, thus making the murder conviction and the jury's finding that Petitioner did not personally use a weapon not inconsistent

However, even if the jury's findings are inconsistent, controlling federal law does not support Petitioner's claim.  The Supreme Court has rejected the proposition that due process requires convictions to always be consistent.  *Standefer v. U.S.*, 447 U.S. 10, 25 (1980).  The Supreme Court has also made clear that inconsistent verdicts may stand when one of the verdicts is a conviction and the other an acquittal.  *Ferrizz v. Giurbino*, 432 F.3d 990, 992 (9th Cir. 2005) (citing *United States v. Powell*, 469 U.S. 57, 65 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932)).  The rationale for this rule is that the acquittal may be an exercise of leniency by the jury not necessarily grounded in its view of the evidence.  *Ferrizz*, 432 F.3d at 993.  Even assuming that the jury's finding that Petitioner did not personally use a weapon and the murder conviction are

29

inconsistent, this inconsistency does not create a violation of Petitioner's constitutional rights.  As stated in *Standefer*, "while symmetry of the results may be intellectually satisfying, it is not required."  *Standefer*, 447 U.S. at 25. Therefore, Petitioner's claim of inconsistent verdicts must be DENIED.

### CONCLUSION

For the foregoing reasons, the petition for the writ of habeas corpus is DENIED.  Petitioner's letter to the Court received March 31, 2006, seeking funds to locate additional witnesses and evidence related to claims not currently before this Court, is DENIED as the Court lacks jurisdiction to expand the record with regard to such claims.  The Clerk shall enter judgment in favor of the Respondent and close the file.

IT IS SO ORDERED.

DATES: July 27, 2006

_____
JEFFREY S. WHITE
United States District Judge

30